## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **STEPHEN PATTEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **THE NORTHERN TRUST COMPANY;** | ) | **No. 08-CV-5912** |
| **NORTHERN TRUST CORPORATION;** | ) | |
| **EMPLOYEE BENEFIT INVESTMENT** | ) | **Hon. Joan H. Lefkow** |
| **COMMITTEE OF THE NORTHERN TRUST** | ) | |
| **COMPANY; JOHN DOES 1-10; EMPLOYEE** | ) | |
| **BENEFIT ADMINISTRATIVE COMMITTEE** | ) | |
| **OF THE NORTHERN TRUST COMPANY;** | ) | |
| **DAWN VANNUCCI; RICHARD ROES 1-10;** | ) | |
| **WILLIAM OSBORN; FREDERICK H.** | ) | |
| **WADDELL, TIMOTHY P. MOEN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### OPINION AND ORDER

Stephen Patten ("Patten"), on behalf of himself, the Northern Trust Company Thrift-Incentive Plan ("the Plan"), and a class of similarly situated Plan participants, has filed a four-count amended complaint under the Employee Retirement Income Security Act ("ERISA"), codified at 29 U.S.C.§§ 1000 *et seq.*, against Northern Trust Company ("Northern Trust Co."), Northern Trust Corporation ("Northern Trust Corp."), the Employee Benefit Investment Committee of the Northern Trust Company ("the Investment Committee"), the Employee Benefit Administrative Committee of the Northern Trust Company ("the Administrative Committee"), Dawn Vannucci, William Osborn, Frederick Waddell, Timothy Moen, and John Does 1-10 and Richard Roes 1-10, who are unidentified members of the Administrative and Investment

Committees (collectively, "defendants").[1]  Patten brings claims for breach of fiduciary duty (Count I) and misrepresentation and nondisclosure (Count II) against all defendants.  Count III is a claim of divided loyalty against the individual defendants.  Count IV is a claim for breach of the duty to properly appoint, monitor, and inform the committees and members of the committees brought against Osborn, Waddell, and Moen.  Before the court is defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  For the following reasons, defendants' motion to dismiss [#45] is granted in part and denied in part.

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  The burden of proof is on the party asserting jurisdiction.  *United Phosphorus, Ltd.* v. *Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003).  In determining whether subject matter jurisdiction exists, the court must accept all well-pleaded facts alleged in the complaint and draw all reasonable inferences from those facts in the plaintiff's favor.  *Sapperstein* v. *Hager*, 188 F.3d 852, 855 (7th Cir. 1999).  "Where evidence pertinent to subject matter jurisdiction has been submitted, however, 'the district court may properly look beyond the jurisdictional allegations of the complaint . . . to determine whether in fact subject matter jurisdiction exists.'"  *Id.* (quoting *United Transp. Union* v. *Gateway W. Ry. Co.*, 78 F.3d 1208, 1210 (7th Cir. 1996)).

A motion to dismiss under Rule 12(b)(6) challenges a complaint for failure to state a claim upon which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(6); *General Elec. Capital Corp.* v. *Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997).  As with a 12(b)(1)

---

[1]  The court has jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

motion, in ruling on a 12(b)(6) motion, the court accepts as true all well-pleaded facts in the

plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor.

*Dixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002).  In order to survive a Rule 12(b)(6) motion,

the complaint must not only provide the defendant with fair notice of the claim's basis, but must

also establish that the requested relief is plausible on its face.  *Ashcroft* v. *Iqbal*, --- U.S. ----,

129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009); *see also Bell Atl.* v. *Twombly*, 550 U.S. 544,

555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

## FACTS[2]

Northern Trust Corp. is a financial holding company that provides investment

management, asset and fund administration, and fiduciary and banking services for corporations,

institutions and individuals.  Northern Trust Co. is its principal subsidiary.  Northern Trust Co.

sponsors the Plan, which is subject to ERISA and intended to encourage savings, particularly for

retirement, among employees.

The Plan qualifies under ERISA as a "defined contribution" or "individual account"

plan.[3]  It offers participants different investment fund options, including the Northern Trust

Stock Fund ("Stock Fund"), which was to be invested "exclusively in shares of [Northern Trust

---

[2] The facts in this section are taken from the Amended Complaint and accepted as true for purposes of resolving this motion.  The court takes judicial notice of matters of public record, such as stock prices and SEC filings.  *See Gen. Elec. Capital Corp.*, 128 F.3d at 1080–81.  The court also consider Plan documents and other filings that defendants have attached to their motion that are referred to in Patten's complaint and central to Patten's claim.  *See Albany Bank & Trust Co.* v. *Exxon Mobil Corp.*, 310 F.3d 969, 971 (7th Cir. 2002).

[3] A "defined contribution" or "individual account" plan is "a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account."  29 U.S.C. § 1002(34).

Defendants maintain that the Plan is an eligible individual account plan ("EIAP"), *see* 29 U.S.C. § 1107(d)(3)(A), and Patten does not contest this assertion.

Corp. common stock], except as otherwise required to provide liquidity for distributions and withdrawals." Northern Trust Company Thrift-Incentive Plan, Schedule B, attached as Ex. A to Defs.' Mot. (hereinafter, "TIP"). The Stock Fund is designated as an Employee Stock Ownership Plan ("ESOP").[4] Participants can direct the Plan to purchase investments in the various funds available under the Plan, which are then allocated to their individual accounts. Northern Trust Co. makes matching contributions that are initially invested in the Stock Fund. As of December 31, 2007, $761,651,355 of the Plan's $1,762,670,445 total investments (approximately 43% of the Plan's assets) were invested in the Stock Fund.

Defendants were fiduciaries of the Plan during the proposed class period of October 19, 2007 to January 14, 2009. Northern Trust Co. serves as the Plan's sponsor and trustee. The Investment Committee is named as a fiduciary for purposes of ERISA with respect to investment responsibilities, and John Does 1-10 were Investment Committee members. The Plan documents give the Investment Committee the discretion to designate investment fund options for the Plan "in addition to or in lieu of" those funds designated by the Plan documents. TIP § 6.1. The Investment Committee is to review the performance of the offered fund option quarterly and consider changes if, among other things, "[t]he returns of the fund are unsatisfactory based on the applicable performance objectives," "[t]he fund no longer meets the applicable investment guidelines," or "[t]here is any regulatory, market or other development that negatively affects the [fund]." Statement of Investment Policies and Objectives (Aug. 23, 2007) at 14, attached as Ex. C to Defs.' Reply. The Administrative Committee is a named fiduciary for purposes of ERISA

_____

[4] An ESOP is an individual account plan "designed to invest primarily in qualifying employer securities." 29 U.S.C. § 1107(d)(6)(A). An ESOP is exempt from certain ERISA requirements. For example, the diversification and prudence requirements of 29 U.S.C. § 1104(a)(1) are not violated by an ESOP's holding of qualifying employer securities. 29 U.S.C. § 1104(a)(2).

for managing and administering the Plan. Vannucci was the chairperson of the Administrative Committee, and Richard Roes 1-10 were other Administrative Committee members. The Plan documents provide the Administrative Committee with "all powers necessary to discharge its duties in administering the Plan including, but not by way of limitation, discretionary authority with respect to . . . constru[ing] and interpret[ing] the Plan." TIP § 10.1. Osborn was Northern Trust Corp.'s CEO until December 31, 2007, at which point Waddell took on this position. As CEOs, Osborn and Waddell were advised of the risks involved in Northern Trust Corp.'s business by the Business Risk Committee of Northern Trust Corp.'s Board of Directors. They also had responsibility for appointing members of the Plan's Administrative and Investment Committees. Moen was Northern Trust Co.'s Executive Vice President and Human Resources Department Head.[5] All defendants "exercised discretionary authority or control respecting management of the Plan or exercised discretionary authority or control respecting management or disposition of assets and had discretionary authority or responsibility in the administration of the Plan." Am. Compl. ¶ 47.

Patten was a Plan participant and his individual account included investments in the Stock Fund.[6] During the proposed class period, the market price of Northern Trust Corp. common stock was artificially inflated as Northern Trust Corp. was undertaking excessively risky investments in structured investment vehicles ("SIVs") and offering auction rate securities.

---

[5] Patten alleges that Moen appointed members of the Administrative and Investment Committees pursuant to TIP § 10.5. Section 10.5, however, provides only that the CEO appoints the members of these committees.

[6] Defendants have submitted documents demonstrating that Patten liquidated his holdings in the Plan on September 15, 2008 upon his termination. *See* Ex. D to Defs.' Mot. On that date, Northern Trust stock closed at $84.09. On October 19, 2007, the beginning of the class period, Northern Trust stock closed at $68.65. The court will consider this evidence in determining whether Patten has standing. *See Sapperstein*, 188 F.3d at 855.

These practices led to financial losses, a decline in the market price of Northern Trust Corp. common stock, and tens of millions of dollars of reductions in Plan participants' accounts.

More particularly, Northern Trust was heavily involved in the auction rate securities market, which promised great profit from short-term earnings. Auction rate securities were presented to investors as being the same as cash and highly liquid safe short-term investments even though they are complex, long-term instruments. By October 2007, problems in the auction rate securities market became widely known, although Northern Trust Corp. continued to encourage investors to purchase such securities. Plan participants were not aware of Northern Trust Corp.'s involvement in the auction rate securities market because it was not disclosed to them and because Northern Trust Corp. had a reputation for conservative financial practices, making it unlikely that it would be involved in such a market. Its involvement in this market, however, exposed it to reputational damage and likely substantial financial losses.

Further, several of Northern Trust Corp.-sponsored investment funds made high-risk investments in SIVs.[7] In February 2008, faced with a likelihood of substantial losses due to these investments, Northern Trust Corp. agreed to provide $229 million in financial backing to shield its funds from potential losses. At the time, a Northern Trust Corp. spokesperson stated that the $229 million was likely the maximum Northern Trust Corp. would have to pay, if it had to pay anything at all, to shore up these funds. In September 2008, however, Northern Trust Corp. announced that it was increasing its support by $321 million, claiming, as it did in February 2008, that it was providing this support to allow its funds to maintain a net asset value

---

[7] SIVs "'raise money by issuing short-term debt and then use the funds to purchase long-term obligations that pay higher interest.'" Am. Compl. ¶ 64 (quoting James P. Miller, *Northern will cover fund loss from SIVs; Bank pledges $229 million to help shield investors from potential problems*, Chi. Trib., Feb. 23, 2008, at C1).

of $1.[8]  This additional outlay meant Northern Trust Corp. recorded a pretax charge of $290

million in the third quarter of 2008.  In this same quarter, it also recorded pretax charges of $150

million to cover clients whose cash collateral was invested in five constant-dollar investment

pools and $85 million to cover costs of a program in which Northern Trust Corp. offered to buy

back certain auction rate securities that it purchased for clients under its investment discretion or

that were acquired by its clients from its affiliated broker/dealer.  In total, Northern Trust Corp.

incurred $525 million in 2008 third quarter charges, reducing its after-tax earnings by $328

million and causing it to take its first quarterly loss since the fourth quarter of 1987.  Despite this

loss, however, Northern Trust Corp.'s Tier 1 capital ratio of 9.2 percent on September 30, 2008

was above the six percent minimum a financial institution needs to be considered well

capitalized.  When news of the 2008 third quarter charges became public on September 30, 2008,

the price of Northern Trust common stock fell by approximately nineteen percent, from $79.90

to $64.87 per share.[9]

## DISCUSSION

### I.  Article III Standing

Defendants argue that Patten does not have standing to bring his ERISA claims.  Whether

Patten has standing is a threshold matter, as the court must determine whether Patten has

"alleged such a personal stake in the outcome of the controversy as to warrant his invocation of

federal-court jurisdiction."  *Warth* v. *Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197, 45 L. Ed. 2d 343

---

[8] The failure to maintain a $1 per share net asset value is termed "breaking the buck," as it
indicates that money market investors lose principal.  *See* Am. Compl. ¶ 68; Miller, *Northern will cover
fund loss from SIVs*, *supra* note 7.

[9] Patten alleges that the stock price fell from $79.90 to $64.87 on September 30, 2008.  This
actually occurred on September 29, 2008.  *See* James P. Miller, *Northern plans big charge; Shares tumble
19% after bank moves to shore up shaky investment funds*, Chi. Trib., Sept. 30, 2008, at C24, attached as
Ex. G to Defs.' Mot.

(1975). To have standing, a plaintiff must meet both constitutional and prudential requirements. Defendants only challenge Patten's constitutional standing, apparently recognizing that the Seventh Circuit's decision in *Harzewski* v. *Guidant Corp.* teaches that Patten has statutory standing under ERISA to bring suit on behalf of the Plan. *See* 489 F.3d 799, 804 (7th Cir. 2007).

To have Article III standing, Patten must establish (1) an injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 1130 L. Ed. 2d 351 (1992). An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (citations omitted) (internal quotation marks omitted). A particularized injury is one affecting the plaintiff in a "personal and individual way." *Id.* at 560 n.1. While a plaintiff's injury may turn "on the nature and source of the claim asserted," *Warth*, 422 U.S. at 500, the merits of the suit should not be conflated with the standing inquiry. *Aurora Loan Servs., Inc.* v. *Craddieth*, 442 F.3d 1018, 1024 (7th Cir. 2006).

Patten claims that he was injured by defendants' failure to prudently manage the Plan. He maintains that he would have received a greater benefit at the time he liquidated his interest in the Plan but for the defendants' breach of fiduciary duty that diminished the Plan's overall value. His damages, he claims, can be measured by the difference between what an appropriate alternative investment would have earned and what the Northern Trust stock did in fact earn. Defendants present evidence, however, that Patten actually benefited from any alleged breaches. At the beginning of the class period on October 19, 2007, when Patten claims Northern Trust stock became an imprudent investment because it was artificially inflated, the stock's closing

price was $68.65.  When Patten cashed out of the Plan on September 15, 2008, Northern Trust's stock closed at $84.09, near its all-time high.  Patten has not identified any other investment that would have yielded a greater return than the Northern Trust stock.  In fact, during the class period, Northern Trust stock outperformed every major stock market index.  *See* Ex. I to Defs.' Mot.; Ex. D to Defs.' Reply.

Despite the fact that the merits may show that Patten actually benefited from defendants' alleged breaches, at this stage, Patten has sufficiently alleged a redressable injury in fact. Defendants' alleged breaches of fiduciary duty constitute invasions of legally protected interests, for defendants, as fiduciaries, owed Patten, a Plan participant, the duties of care, loyalty, and prudence.  *See Ziegler* v. *Conn. Gen. Life Ins. Co.*, 916 F.2d 548, 551 (9th Cir. 1990) ("Under 29 U.S.C. § 1104(a), . . . an ERISA plaintiff may prosecute a plan fiduciary who fails to perform for the exclusive benefit of participants and their beneficiaries regardless of cost or loss to the participants and their beneficiaries.");￼*Almonor* v. *BankAtlantic Bancorp, Inc.*, No. 07-61862-CIV-UNGARO, Dkt. No. 82, at 9 (S.D. Fla. July 15, 2009); *Bendaoud* v. *Hodgson*, 578 F. Supp. 2d 257, 272 (D. Mass. 2008).  Thus, the alleged breaches themselves constitute injuries for which redress may be sought in this court.

In *Harzewski*, the Seventh Circuit noted that the plaintiffs, who had cashed out of their plan and likely benefited from the alleged breach of fiduciary duty, "obviously . . . have standing to sue in the sense of being entitled to ask for an exercise of the judicial power of the United States as that term in Article III of the Constitution has been interpreted, because if they win they will obtain a tangible benefit."  *Harzewski*, 489 F.3d at 803.  While noting that it "seems exceedingly speculative to suppose that [defendant] in its capacity as plan fiduciary should and

9

would have found a substitute investment that would have turned out as well," the court stated

that consideration of how plaintiffs were injured was an issue for a later day. *Id.* at 807.

Similarly, if Patten is able to demonstrate that defendants should have found an investment that

would have performed better than Northern Trust stock, he will obtain a tangible benefit. The

court is not in a position to determine the extent of Patten's injury – his damages – at this stage

because to do so would require an examination of the merits of Patten's claim. Accordingly,

Patten's allegations that the Plan suffered losses because of defendants' actions are sufficient.

Whether Patten actually benefited from the breaches, thus barring recovery, is an issue of

damages, not of injury, and one that will be considered at the appropriate time, after the parties

have engaged in some discovery. *See Almonor*, No. 07-61862-CIV-UNGARO, Dkt. No. 82, at

10-12; *Jones* v. *NovaStar Fin., Inc.*, No. 08-00490-CV-W-NKL, 2009 WL 331553, at *5 (W.D.

Mo. Feb. 11, 2009).

The court recognizes that its conclusion is in conflict with decisions of other district

courts that have found, in analogous situations, that the plaintiffs did not have Article III

standing where they sold their stock holdings at a time when the stock was artificially inflated.

*See Brown* v. *Medtronic*, 619 F. Supp. 2d 646 (D. Minn. 2009);[10] *In re Boston Scientific Corp.*

*ERISA Litig.*, 254 F.R.D. 24 (D. Mass. 2008). The court finds these cases unpersuasive for the

reasons stated above. Further, in *In re Boston Scientific*, the court initially determined that

plaintiffs had standing because they had alleged that their benefits shrank due to defendants'

breach of fiduciary duty (as Patten has alleged in this case). *In re Boston Scientific*, 254 F.R.D.

at 29. Only after extensive discovery did the court reverse itself, finding that, based on the

_____

[10] The plaintiff in *Brown* appealed the court's decision on the standing issue and his appeal is
currently pending in the Eighth Circuit. *See Brown* v. *Medtronic, Inc.*, No. 09-2524 (8th Cir. filed June
24, 2009).

detailed information then presented, the plaintiffs had benefited from the artificial inflation of the stock price. While discovery may show that Patten cannot establish that he was damaged by defendants' alleged breach, as no alternative investment would have provided him with a greater return, that is not the question properly before the court at this stage and upon this record. Thus, having concluded that Patten has standing, the court will proceed to consider defendants' other challenges.

## II.    Fiduciary Status

Defendants first argue that only the Investment Committee and its individual members are proper defendants, as a claim for breach of fiduciary duty is only valid against a fiduciary, and the other defendants were not fiduciaries with respect to investment decisions. *See Klosterman* v. *W. Gen. Mgmt., Inc.*, 32 F.3d 1119, 1122 (7th Cir. 1994) ("A claim for a breach of fiduciary duties under ERISA is only valid against a 'fiduciary.'"). Under ERISA,

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). Congress intended the term "fiduciary" to be construed broadly. *See Rogers* v. *Baxter Int'l, Inc.*, 417 F. Supp. 2d 974, 986 (N.D. Ill. 2006) (citing *Chi. Bd. Options Exch., Inc.* v. *Conn. Gen. Life Ins. Co.*, 713 F.2d 254, 260 (7th Cir. 1983); *Six Clinics Holding Corp.* v. *Cafcomp Sys., Inc.*, 119 F.3d 393, 401 (6th Cir. 1997)). "[A] person may be a fiduciary for some purposes, but not for others." *Plumb* v. *Fluid Pump Serv., Inc.*, 124 F.3d 849, 854 (7th Cir. 1997). Although the plan documents may expressly name fiduciaries for certain purposes, a

person may also be considered a "functional fiduciary" if he falls within ERISA's definition of the term.  *Id.* at 855.

The Investment Committee is clearly a fiduciary with respect to investment decisions. TIP § 2.1(ii).  The Administrative Committee, although only a named fiduciary with respect to administering the Plan, *id.* § 2.1(q), has "all powers necessary to discharge its duties in administering the Plan including, but not by way of limitation, discretionary authority . . . to construe and interpret the Plan."  *Id.* § 10.1.  Thus, an inference can be drawn that part of its duties included determining whether investment in the Stock Fund was required and what information was disseminated to Plan participants.  The other defendants are not named fiduciaries, but Patten has alleged that they were functional fiduciaries or, in the case of Northern Trust Corp. and Northern Trust Co., are also vicariously liable for the conduct of other Plan fiduciaries.   Tracking ERISA's definition of a "fiduciary," Patten has alleged that defendants were fiduciaries because "they exercised discretionary authority or control respecting management of the Plan or exercised discretionary authority or control respecting management of the Plan and had discretionary authority or responsibility in the administration of the Plan." Compl. ¶ 47.  To support this assertion, he alleges that "[d]efendants had the discretion to establish and change the investment alternatives among which Participants could direct the investment of the Plan's assets allocated to their accounts."  *Id.* ¶ 44.

As the determination of a defendant's fiduciary status is a fact-intensive one, courts in this district have found it premature to decide the issue in ruling on a motion to dismiss when a plaintiff has alleged that a defendant was a functional fiduciary. *See, e.g.*, *George* v. *Kraft Foods Global, Inc.*, No. 08 C 3799, 2009 WL 4884027at *14 (N.D. Ill. Dec. 17, 2009); *Porterfield* v. *Orecchio*, No. 07 C 3654, 2008 WL 130921, at *3 (N.D. Ill. Jan. 9, 2008) ("[A] determination as to what extent an alleged fiduciary exercised control of ERISA plan assets is typically premature at the motion to dismiss stage because the court lacks sufficient facts to make the necessary analysis."); *Smith* v. *Aon Corp.*, No. 04 C 6875, 2006 WL 1006052, at *4 (N.D. Ill. Apr. 12, 2006); *Rogers*, 417 F. Supp. at 985.[11]  Because the Plan documents do not conclusively control the determination of who is a fiduciary, Patten has sufficiently alleged that all defendants were functional fiduciaries with respect to investment decisions for the Plan, and further factual development is necessary to test Patten's allegations, the court cannot conclude at this stage that he cannot state a claim against defendants because they were not fiduciaries.[12]  Thus, the court will not dismiss any of the defendants on this basis.

---

[11] Although some court have decided the matter on a motion to dismiss, other courts have also declined to address the issue at this stage. *See, e.g.*, *Will* v. *Gen. Dynamics Corp.*, No. 06-698-GPM, 2009 WL 3835883, at *2 (S.D. Ill. Nov. 14, 2009); *Spano* v. *Boeing Co.*, No. 06-cv-743-DRH, 2007 WL 1149192, at *3 (S.D. Ill. Apr. 18, 2007); *Woods* v. *S. Co.*, 396 F. Supp. 2d 1351, 1365 (N.D. Ga. 2005); *In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig.*, 312 F. Supp. 2d 1165, 1178–79 (D. Minn. 2004); *In re Elec. Data Sys. Corp. "ERISA" Litig.*, 305 F. Supp. 2d 658, 665 (E.D. Tex. 2004).

[12] Defendants also argue that Northern Trust Co. and Northern Trust Corp. cannot be held vicariously liable for the conduct of Plan fiduciaries.  Although the court need not address this, having found that Patten has at this stage sufficiently alleged that they acted as functional fiduciaries, it notes that whether *respondeat superior* applies to ERISA claims is an unsettled question in this circuit.  *See Howell* v. *Motorola, Inc.*, 337 F. Supp. 2d 1079 (N.D. Ill. 2004) ("Our Court of Appeals has expressed reluctance to graft common-law causes of action on to the comprehensive ERISA statute.  It has not, however, held that doctrines of *respondeat superior* are inapplicable to claims brought under the Act.  A complaint should be dismissed under Rule 12(b)(6) only if no set of facts could support it.  Although the court may be willing to reconsider the legal question on a more fully-developed factual record, the court will at this stage permit Plaintiff to proceed in its claim against Motorola under a *respondeat superior* doctrine.").

**III.    Breach of the Duty of Prudence (Count I)**

ERISA requires fiduciaries to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aim."  29 U.S.C. § 1104(a)(1)(B).  Although an EIAP or ESOP does not violate the duty of prudence by investing in company stock, *see id.* § 1104(a)(2), there may be situations where the duty of prudence requires an EIAP or ESOP to diversify its holdings.  *See Pugh* v. *Tribune Co.*, 521 F.3d 686, 699 (7th Cir. 2008) (citing *Summers* v. *State St. Bank & Trust Co.*, 453 F.3d 404, 410 (7th Cir. 2006)).  An EIAP or ESOP fiduciary is generally entitled to a presumption of prudence where investment in company stock is required, as "he risks being sued for violating the plan if he diversifies but may impose unwarranted risk on the participants if he doesn't."  *Id.* at 701 (citing *Summers*, 453 F.3d at 410).  Thus, a plaintiff "must show that the ERISA fiduciary could not have reasonably believed that the plan's drafters would have intended under the circumstances that he continue to comply with the ESOP's direction that he invest exclusively in employer securities."  *Summers*, 453 F.3d at 410 (quoting *Kuper* v. *Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995)) (internal quotation marks omitted); *see also Moench* v. *Robertson*, 62 F.3d 553, 571–72 (3d Cir. 1995).

The presumption of prudence would apply here if it is the Plan's expectation that Northern Trust stock be a required investment option but not where the decision of whether to offer company stock as an option is left to the fiduciaries' discretion.  Although some courts have found it appropriate to apply the presumption in deciding a motion to dismiss – and the Seventh Circuit has endorsed this view, *see Pugh*, 521 F.3d 686 – others have noted that doing so is

inappropriate as presumptions are evidentiary standards not relevant to the pleading stage. *See, e.g.*, *Smith*, 2006 WL 1006052, at *5 ("If the Plan is an ESOP, Defendants clearly are entitled to a presumption of reasonableness, but this presumption cannot protect Defendants at the motion to dismiss stage of this litigation. Plaintiffs' only burden at this stage is to put Defendants on notice of a viable claim for relief, and Plaintiffs have done so."); *In re Pfizer Inc. Erisa Litig.*, No. 04 Civ. 10071(LTS)(JFE), 2009 WL 749545, at *11 (S.D.N.Y. Mar. 20, 2009) ("Whether a plaintiff can overcome the presumption of prudence is an evidentiary question 'ill-suited to resolution on a motion to dismiss.'" (citation omitted)).

The parties initially dispute whether the Plan was required to offer the Stock Fund as an investment option, an issue that dictates whether the presumption of prudence applies. Patten claims that even though the Stock Fund is an ESOP, the Plan itself does not require that the Stock Fund be offered as an investment option, making the presumption inapplicable. Patten's argument is not that the Stock Fund itself should have been diversified, but rather that the Stock Fund should not have been offered as an investment option when Northern Trust stock became an imprudent investment. In support of his argument that offering the Stock Fund as part of the Plan was discretionary, Patten cites to Article 6.1 of the Plan, which provides that "[t]he Investment Committee may select other investment funds, in addition to *or in lieu of*, the Investment Funds set forth in Schedule B." TIP § 6.1 (emphasis added). Thus, Patten alleges that defendants had the ability to, and were required to, remove the Stock Fund as an investment option when it became imprudent. *See* Compl. ¶¶ 17, 45. Defendants cite to other language in the Plan documents stating that matching contributions are first to be made to the Stock Fund as evidence that the fiduciaries did not have any discretion as to whether the Stock Fund was offered as an

investment option. *See* TIP § 6.3. They also point to the fact that the Thrift Trust indicates that the Plan "*shall* be composed of the Northern Trust Stock Fund *and* any other Investment Funds," Thrift Trust Art. 5 (emphasis added), and that the Plan has extensive provisions related to the Stock Fund. *See, e.g.*, TIP § 6.5 (voting rights for company stock held in the Plan's funds), § 6.7 (dividends and dividend reinvestment), § 9.5 (distributions). These provisions, defendants argue, reflect Northern Trust Co.'s intent that the Stock Fund be a required Plan investment option. Because the court is to accept Patten's well-pleaded allegations and cannot say that the Plan documents compel a different conclusion at this stage, the court finds that the Plan was not required to offer the Stock Fund as an investment option and so will not apply the presumption of prudence here.

Without the benefit of the presumption, the totality of the circumstances concerning the investment decision should be considered to determine whether it was prudent, including such factors as "the plan structure and aims, the disclosures made to participants regarding the general and specific risks associated with investment in company stock, and the nature and extent of challenges facing the company that would have an effect on stock price and viability." *DiFelice* v. *U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007); *see also Armstrong* v. *LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 732–33 (7th Cir. 2006) (prudence "involves a balancing of competing interests under conditions of uncertainty"). The court must look at more than just the outcome of the investment, as compliance with one's fiduciary duty "requires prudence, not prescience." *DeBruyne* v. *Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 465 (7th Cir. 1999). Fiduciaries do not have a duty "to continuously audit operational affairs," but instead only have a duty to investigate "when there is some reason to suspect that investing in company stock

may be imprudent – that is, there must be something akin to a 'red flag' of misconduct." *Pugh*, 521 F.3d at 700.

Here, Patten has alleged that the Stock Fund was an imprudent investment because the stock price was artificially inflated and that defendants knew or should have known this to be the case. He claims that Northern Trust stock was artificially inflated because of Northern Trust's involvement in auction rate securities and SIVs, exposing Northern Trust to financial losses and reputational damage. Because Northern Trust's focus during the class period is alleged to have been on short-term earnings, Northern Trust stock was thus not a suitable investment option for retirement savings. During the class period, Northern Trust did infuse over $550 million into its funds that invested in failed SIVs and incurred $525 million in 2008 third quarter charges. The third quarter charges reduced Northern Trust's after-tax earnings for that quarter by $328 million. The result of this imprudent investment is alleged to have been an almost nineteen percent drop in the value of Northern Trust stock from $79.90 to $64.87 per share on September 29, 2008 after the third quarter charges were publicly announced. This one-day drop is not enough on its own to state a claim for imprudent investment. *See Brieger* v. *Tellabs, Inc.*, 629 F. Supp. 2d 848, 862–63 (N.D. Ill. 2009) ("The fact that the stock price dropped significantly during the class period is not, on its own, conclusive." (citing *Edgar* v. *Avaya, Inc.*, 503 F.3d 340, 348 (3d Cir. 2007); *Wright* v. *Or. Metallurgical Corp.*, 360 F.3d 1090, 1099 (9th Cir. 2004))). Patten has not alleged that the decline in stock price was persistent or indicated that Northern Trust Corp. was on the verge of collapse, and, in fact, it appears that he cannot do so as Northern Trust Corp.'s common stock consistently outperformed the market during the class period.[13] The court, however, cannot go so

---

[13] The court takes judicial notice of publicly available stock prices, allowing it to compare

(continued...)

far as to conclude that Patten can prove no set of facts that would entitle him to relief.  The Plan

was intended in part to encourage retirement savings and Patten has alleged that the strategy

Northern Trust Corp. adopted in pushing auction rate securities and investing in SIVs was not

appropriate for long-term earnings.  Because prudence is considered in light of the fiduciaries'

balancing of competing interests and it is plausible that Northern Trust Corp.'s common stock

was not a prudent investment for purposes of the Plan, the court cannot conclude that Patten

cannot state a plausible claim for imprudent investment on this basis.

Nevertheless, Patten still must allege enough facts to indicate that defendants knew facts

indicating that the Northern Trust stock was an imprudent investment for the Plan or that "red

flags" triggered their duty to investigate.  Patten does not respond to defendants' arguments that

he has only conclusorily alleged that defendants knew the facts at issue.  "A conclusory

statement that all defendants should have known specific facts about a company is generally

insufficient to state a claim; it must be alleged that each defendant was in a position to know or

learn of the information."  *Pugh*, 521 F.3d at 701.  Patten does allege that Osborn and Waddell

were aware of Northern Trust Corp.'s imprudent involvement with auction rate securities and

investments in SIVs because of their positions as CEOs and because they were advised of the

risks by the Business Risk Committee of Northern Trust Corp.'s Board of Directors.[14]  *See*

---

[13](...continued)
Northern Trust Corp. common stock's performance to market indicators.  *See Pugh*, 521 F.3d at 691 n.2, 701.  Defendants have attached a chart to their motion and reply comparing Northern Trust stock during the class period to the S&P 500, Dow Jones Industrial Average, and NASDAQ Composite Indexes.  *See* Ex. I to Defs.' Mot.; Ex. D to Defs.' Reply.  These charts show that Northern Trust stock consistently outperformed the three indexes.

[14] Defendants argue that, even if they possessed material nonpublic information about Northern Trust that would have indicated that investment in Northern Trust stock was imprudent, they could not have acted on this knowledge without violating federal securities laws.  Although the Seventh Circuit in *Harzewski* noted that "[i]t probably would have been unlawful . . . for [defendant] to sell [defendant's]

(continued...)

Compl. ¶¶ 23–24. As one of Northern Trust Co.'s executive vice presidents, Moen is also likely to have been privy to such information. Patten has not alleged, however, how the Administrative and Investment Committees and their members would have been privy to nonpublic information about Northern Trust Corp.'s operations. Once information about Northern Trust Corp.'s investments in auction rate securities and SIVs became public, they may have had the requisite knowledge triggering the duty to investigate whether continued investment in Northern Trust Corp.'s common stock was a prudent investment option for the Plan to maintain.

When this duty to investigate was triggered is not clearly answered by the Amended Complaint. Although Patten cites to various public announcements in October 2007 about problems with auction rate securities, he admits that at that time no one suspected that Northern Trust was involved in these securities and so this general information cannot be used to support a theory that defendants were on notice to investigate as a result. Northern Trust's announcement in February 2008 that it was providing financial backing to shield its investment funds from potential losses caused by investment in troubled SIVs, specific to Northern Trust's operations, may be enough to have triggered defendants' duty to investigate.[15] Thus, because Patten's allegations can be read to plausibly suggest that at some point during the class period the

_____

[14](...continued)
stock held by the pension plan on the basis of inside knowledge of the company's problems," *Harzewski*, 489 F.3d at 808, the Seventh Circuit has not definitively answered this question. *See Rogers* v. *Baxter Int'l, Inc.*, 521 F.3d 702, 706 (7th Cir. 2008) (noting that the issue of whether corporate insiders may act on nonpublic information in their role as fiduciaries for pension plans "remains unanswered"). Further, Patten claims that defendants concealed material nonpublic information "that they were not precluded from disclosing under applicable law," Am. Compl. ¶ 76, implicitly acknowledging that he is not contending that insider information that would have placed defendants at risk of prosecution for securities violations should have been disclosed.

[15] If this is the time at which defendants should have realized they should investigate whether the Plan should continue offering Northern Trust stock as an investment option, it appears that the class period should not extend back to October 14, 2007 for at least the Administrative and Investment Committees and their members.

defendants knew the Stock Fund was not a prudent investment for the Plan, or that they had a duty to investigate the issue, the court will not dismiss Patten's imprudent investment claim. While it seems unlikely that a reasonable factfinder could find that the decision to maintain the Plan's investment in Northern Trust stock was imprudent due to its strong performance in a difficult market, a court's opinion that a claim is unlikely to succeed is not a basis to grant a motion to dismiss.

## IV.     Misrepresentation and Nondisclosure Claim (Count II)

Fiduciaries must disclose material facts affecting the interests of plan participants. *Vallone* v. *CNA Fin. Corp.*, 375 F.3d 623, 640 (7th Cir. 2004).  They breach their fiduciary duty if they "mislead plan participants or misrepresent the terms or administration of a plan." *Anweiler* v. *Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 991 (7th Cir. 1993).  Negligent omission, however, is not actionable; the fiduciary "must have set out to disadvantage or deceive its employees . . . in order for a breach of fiduciary duty to be made out."  *Vallone*, 375 F.3d at 642.

Patten has alleged that defendants breached their fiduciary duties by failing to inform Plan participants of material information related to "the risk and reward characteristics of the Northern Trust Stock Fund."  Compl. ¶ 93.  Defendants were not required, however, to generally share specific information about investments offered by the Plan.  *See Brieger*, 629 F. Supp. 2d at 866 ("Plaintiffs have cited no authority holding that participants in an ERISA plan are entitled to receive daily or weekly disclosures with the most up-to-date information regarding the company's performance or the performance of its specific products."); *Lingis* v. *Motorola, Inc.*, 649 F. Supp. 2d 861, 876 ("[W]hile Defendants may have had some obligation to disclose Plan-specific information to beneficiaries, they were under no duty to generally share additional information

about any of the various investments . . . offered by the Plan.  Creating a standard that requires

Plan fiduciaries to continuously gather and disclose nonpublic information bearing some relation

to the plan sponsor's financial condition would extend [ ] the statutory language [of ERISA]

beyond [its] plain meaning." (quoting *Cokenour* v. *Household Int'l, Inc.*, No. 02 C 7921, 2004

WL 725973, at *8) (internal quotation marks omitted) (alterations in original)); *Edgar* v. *Avaya*,

503 F.3d 340, 349 (3d Cir. 2007); *In re Citigroup Erisa Litigation*, No. 07 Civ 9790, 2009 WL

2762708, at *22 (S.D.N.Y. Aug. 31, 2009) ("[I]t is quite another matter to suggest that a fiduciary

must volunteer financial information about companies in which participants may invest.  That

would transform fiduciaries into investment advisors, and as the Third Circuit has written,

fiduciaries do not have a duty to give investment advice or to opine on the stock's condition."

(quoting *Edgar*, 503 F.3d at 350) (internal quotation marks omitted)).

　　　　Thus, defendants had no duty to disclose information concerning Northern Trust's

involvement in auction rate securities or investment in SIVs unless they provided participants

with materially misleading information in their fiduciary capacities that they had to correct.

Patten has not alleged this to be the case.  In his response, he argues that Northern Trust Corp.'s

SEC filings negligently omitted material information about the Company's business and that,

because these SEC filings were made available to participants, defendants breached their duty by

not correcting them.  While the court doubts that the complaint sufficiently indicates that the

alleged nondisclosures should have been made in the SEC filings, even if it did, such omissions

would not be actionable, as Patten admitted they were made "negligently" and has not sufficiently

alleged that defendants intended to disadvantage Plan participants in making them.[16]  *See Vallone*,

---

[16] Whether the SEC filings would qualify as fiduciary communications is an open question.  The
(continued...)

375 F.3d at 642.

In fact, the SPD provided to Plan participants appears to have sufficiently disclosed the risks associated with investment in any of the Plan's investment funds.  It clearly stated that each investment fund "has its own degree of growth potential and risk" and that, among the options offered, the Stock Fund had the greatest risk, along with the greatest potential for investment growth.  *See* Your Sourcebook: A Guide to the Thrift-Incentive Plan (September 2005), at 14–15, attached as Ex. K to Defs.' Mot (hereinafter "SPD").  The SPD further counseled that the funds' past performance was not a guarantee that such results would continue and that there was no guarantee against losses.  *See id.* at 18, 34 ("The selection and timing of your investment choices are solely your responsibility.  Past performance is not a guarantee of future results. . . . Investment returns are not guaranteed by The Northern Trust Company and neither the Company nor any plan fiduciary is liable for any losses that might result from your investment choices.").  Thus, because Patten has not adequately alleged that defendants failed to disclose material information with the intention of disadvantaging or deceiving Plan participants, his misrepresentation and nondisclosure claim will be dismissed.[17]

---

[16](...continued)
SEC filings were made in Northern Trust Corp.'s corporate capacity and referred to in the summary plan description ("SPD") pursuant to ERISA's disclosure obligations.  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(2)(ii).  Thus, any omissions or misrepresentations could not be actionable as a breach under ERISA, as they would not have been made in any of the defendants' fiduciary capacity.  *See Lingis*, 649 F. Supp. 2d at 875 ("[A]ny misrepresentation Defendants may have made were made in their capacities as corporate officials, and are remediable under the securities laws rather than ERISA.").  ERISA fiduciaries, however, may violate their fiduciary obligations if they disseminate false information, including false SEC filings, to plan participants.  Because here, defendants are not alleged to have encouraged participants to review these filings, but instead only stated that they were available if participants wished to review them, it seems unlikely that the SEC filings could be used as a basis for finding that defendants breached their duty not to misrepresent or fail to disclose material facts about the Plan.

[17] The court need not reach defendants' argument that this count should be dismissed because Patten cannot demonstrate that any alleged nondisclosure caused loss to the Plan.

## V. Divided Loyalty of the Individual Defendants (Count III)

ERISA fiduciaries owe Plan participants a duty of loyalty. 29 U.S.C. § 1104(a)(1)(A). Although ERISA allows fiduciaries to also be company employees or officers, *see id.* § 1108(c)(3), ERISA requires "that the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions." *Pegram* v. *Herdrich*, 530 U.S. 211, 225, 120 S. Ct. 2143, 147 L. Ed. 2d 164 (2000); *see also Donovan* v. *Bierwith*, 538 F. Supp. 463, 468 (E.D.N.Y. 1981) ("[W]hen acting on behalf of the fund, [a fiduciary's] primary loyalty to the fund is the only loyalty which may affect his judgment.").

Patten has alleged that the individual defendants breached their duty of loyalty by acting in their own interests instead of solely in the interests of the Plan participants. He has not alleged, however, that Vannucci, John Does 1-10, or Richard Roes 1-10 were Northern Trust officers or employees so as to create a potential conflict between their own interests as employees of Northern Trust and their roles as Plan fiduciaries. Patten has identified Osborn, Waddell, and Moen, however, as Northern Trust employees. Because it is plausible that Osborn's, Waddell's, and Moen's interests as Northern Trust officers and Plan fiduciaries conflicted – the Plan was intended primarily to provide for retirement savings while Northern Trust Corp.'s goals were business-oriented – Patten's divided loyalty claim may proceed against these defendants. Consequently, Patten's breach of loyalty claim against all but Osborn, Waddell, and Moen will be dismissed.

**VI.     Breach of the Duty to Properly Appoint, Monitor, and Inform (Count IV)**

Defendants argue that Patten's claim for breach of the duty to properly appoint, monitor, and inform the Administrative and Investment Committees and their members must be dismissed because it is predicated on the existence of underlying breaches of fiduciary duty that are meritless. Although such a conclusion would be compelled by a finding that Patten had not stated a claim for any breach of fiduciary duty, *see, e.g.*, *Pugh*, 521 F.3d at 702, because the court has found that Patten may proceed on his imprudent investment claim, the court will not dismiss this count.

<b><u>CONCLUSION AND ORDER</u></b>

For the foregoing reasons, defendants' motion to dismiss [#45] is granted in part and denied in part. Count II is dismissed against all defendants and Count III is dismissed against Vannucci, John Does 1-10, and Richard Roes 1-10. Defendants have fourteen days to answer the remaining allegations of the complaint.

Dated: March 9, 2010                Enter: _____
                                            JOAN HUMPHREY LEFKOW
                                            United States District Judge